SATELLITE TELEVISION & ASSOCIATED RESOURCES, INC., Appellant,

v.

CONTINENTAL CABLEVISION OF VIRGINIA, INC., et al., Appellees.

No. 82–1354.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 11, 1982.

Decided Aug. 11, 1983.

Rehearing and Rehearing En Banc Denied Sept. 27, 1983.

---

Dudley H. Chapman, Washington, D.C. (Keith I. Clearwaters, Chapman & Clearwaters, Washington, D.C., Patrick M. McSweeney, Jack W. Burtch, Jr., McSweeney, Stutts & Burtch, Richmond, Va., on brief), for appellant.

Martin Michaelson, Washington, D.C. (Robert J. Kenney, Jr., John E. Hoover, Hogan & Hartson, Washington, D.C., Everette G. Allen, Jr., Charles F. Witthoefft,

Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., on brief), for appellees.

Before RUSSELL and HALL, Circuit Judges, and GORDON *, Senior District Judge.

GORDON, Senior District Judge.

Plaintiff, Satellite Television & Associated Resources, Inc. (STAR), and defendants, Continental Cablevision, Inc., Continental Cablevision of Virginia, and Continental Cablevision of Richmond (Continental)[1] operate pay television services in the City of Richmond and the surrounding area.[2]

On September 4, 1980, STAR filed suit against Continental alleging violations of the Sherman Act, 15 U.S.C. § 1, *et seq.*, and the Virginia Antitrust Act, *Va.Code* §§ 59.-1–9.5 & 59.1–9.6 (1950). Later STAR added an allegation of violations of the Clayton Act, 15 U.S.C. § 12 *et seq.*

In its final amended complaint STAR alleged that Continental had entered into an illegal contract, combination and conspiracy with the apartment owners in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton Act, 15 U.S.C. § 14. STAR alleged also that Continental had monopolized and attempted to monopolize the pay television market in Metropolitan Richmond in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Finally STAR alleged that the same actions by Continental were violations of the Virginia Antitrust Act.

The case was decided by the District Court in March 1982 based on affidavits, exhibits and jointly stipulated facts submitted by the parties. The District Court dismissed the Section 3 Clayton Act claim on the court's finding that Continental of-fered television programming, a service, and therefore was outside the purview of the Act.[3]

The court granted Continental's motion for summary judgment on all remaining claims. The court rejected STAR's contention that although Metropolitan Richmond is the market for antitrust purposes, Henrico County and Richmond proper are "submarkets" monopolized by Continental. Accepting Continental's broader definition of the relevant market, the court rejected the Section 1 Sherman Act claim because the effects of Continental's exclusivity provision were found to be procompetitive in the short run and not substantially anticompetitive in the long run. Moreover, the court found that Continental lacked both the requisite intent and market power to have violated Section 2 of the Sherman Act. The Virginia Antitrust Act tracks the federal statute, and therefore the state claims failed as well.

We find the result reached by the District Court to be correct, and with some elaborations affirm.

Continental is the more successful of the two operations; both having started transmitting at about the same time, March of 1979. Continental had at least 19,500 subscribers by February, 1981, while STAR had about 1,400.

Continental gained this advantage, claims STAR, largely because of an exclusivity clause in its contracts with the owners of the Henrico County and Richmond City apartment complexes.

In 1978, concerned about the very high cost of wiring multiple dwelling units (MDU's) for cable and the risk of not receiving an adequate return on capital ex-

---

* The Honorable Eugene A. Gordon, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

1. STAR operates in the Richmond area through several subsidiaries, the structure of which is irrelevant to the lawsuit. Similarly the three "Continentals" are interrelated, and the relationships have no relevance to the lawsuit as decided. Therefore "Continental" will be used in the singular throughout to refer to all three.

2. "Metropolitan Richmond" includes Charles City County, Chesterfield County, Goochland County, Hanover County, Henrico County, New Kent County, Powhatan County and Richmond City.

3. The Act covers the lease or sale of "goods, wares, merchandise, machinery, supplies, or other commodities. . . ." 15 U.S.C. § 14.

pended to wire MDU's, Continental gave apartment owners wanting cable hookups two options: either pay the expense of wiring their buildings for cable or give Continental exclusive pay television rights to their MDU's. Apartment owners were forced to this choice if they wanted to offer their tenants cable; and thereby stay competitive with other apartment owners offering cable. At all times the owners were free to reject Continental's offer and contract with STAR for its direct broadcast television service. Apparently the apartment owners, the majority of whom owned complexes located in Henrico, chose to give Continental exclusive contracts, which STAR argues severely hurt its ability to compete. Continental began using the exclusivity provisions in July 1978 and agreed to abandon them in June 1980, when STAR was successfully delaying FCC proceedings necessary to Continental's profitability by objecting to the provision to the FCC. The exclusivity provisions are no longer enforced nor are they put in new contracts.

## I.

■ The first issue in this case is its posture on review. The case may be reviewed as either a summary judgment or as a full trial—tried by the Court on stipulated facts, exhibits and affidavits. We will review the case as one tried by the District Court; we will upset a finding of fact made by the court only if the finding is judged by us to be clearly erroneous.[4]

We treat the case as one tried by the District Court because neither side requested a jury trial; both sides negotiated extensively over the joint stipulations—adding a twelve volume appendix—and both sides agree that the case was submitted on this basis with no material issues of fact in dispute. *Vetter v. Frosch,* 599 F.2d 630, 632–33 (5th Cir.1979). Treating the case as one coming to us on summary judgment would accomplish nothing more than to risk the needless expenditure of the resources of

the litigants and the District Court—a result all parties are to be commended for having avoided thus far.

## II.

The second issue to be decided by this Court is whether or not the District Court erred in ruling that the validity of Continental's exclusivity provision is properly considered under the Rule of Reason or the *Per Se* rule of illegality.

■ We think that the District Court was correct in its decision to apply the Rule of Reason. *Per se* rules of liability should be applied to conduct only when the "pernicious effect on competition and lack of redeeming virtue" are manifest. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–51, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Exclusive dealing contracts which might function to increase interbrand competition have never been held to be a *per se* violation of the antitrust laws by the Supreme Court. *Bravman v. Bassett Furniture Industries, Inc.,* 552 F.2d 90, 101 (3rd Cir.) *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). Especially when the parties have stipulated that Continental would not have wired MDU's, thereby leaving STAR as the only pay TV service, without such a guaranty or payment upfront, the court below was justified in holding that the competitive effects of the provision should be judged by the Rule of Reason. Plaintiff bases its *per se* argument on the equivalent of the exclusivity provision to a tie-in; here the alleged tie is between the transmission equipment installed in the buildings and the programming. Like the District Court, we conclude that the programming and the transmission equipment are one product. It is clear to this Court that the transmission equipment is incidental to the provision of the service, which is the dominant factor in the transaction. *Tri-State Broadcasting Co. v. United Press International, Inc.,* 369 F.2d 268 (5th Cir. 1966).

---

4. We treat the Clayton Act and damages claims which were handled on a motion to dismiss as being the equivalent of summary judgment,

Fed.R.Civ.R. 12(c), and, in this case, trial because the factors listed above apply equally to that claim.

## III.

There are several types of exclusivity provisions which have come before the courts—in the main, exclusive dealership or territory provisions have been sanctioned because the effected increase in interbrand competition has outweighed the decrease in intrabrand competition; *see, Continental T.V. Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568. Exclusive requirement contracts have been sanctioned when the effect on immediate and future competition in the relevant market was not substantial and the contract provided a mutual benefit to buyer and seller; *see, Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). In contrast, tying agreements have suffered at the hands of the courts for "[serving] hardly any purpose beyond the suppression of competition", *Standard Oil Co. of California v. United States,* 337 U.S. 293, 305, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949) [Discussion of *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947)].

These appellations, like most others in the law, are convenient shorthands, but in each case the effects of the contract clause or practice at issue differ—and must be scrutinized. This case is no different.

The relative merits and demerits of the provision in regard to Continental, STAR, and apartment owners and dwellers can be distilled into one question, which the District Court broke down into two parts: Does the exclusivity provision substantially lessen competition, Now? In the future? Only this issue is necessary and sufficient to determine validity of exclusivity provision. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692–96, 98 S.Ct. 1355, 1365–68, 55 L.Ed.2d 637 (1978).

In order to answer this two-pronged question, we must first define the relevant market because the concept of competition has no meaning outside its own arena; however broadly that arena is defined. *See, G. Hale & R. Hale, Market Power: Size and Shape under the Sherman Act* § 3.7 at 116 (1958), cited in *Comment, Relevant Geographic Market Delineation: The Interchangeability of Standards in Cases Arising under Section 2 on the Sherman Act and Section 7 of the Clayton Act,* 1979 Duke L.J. 1152, 1157, n. 29.

■ The plaintiff in an antitrust case bears the burden of proof on the issue of the relevant product and geographic markets. *Gough v. Rossmoor Corp.,* 585 F.2d 381, 389 (9th Cir.1978).

■ After considering the contentions of the parties, the District Court held the relevant product market to be "those products or services which are 'reasonably interchangeable by consumers for the same purposes'", *United States v. E.I. Dupont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The Court found that "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses for customers who live in single-family dwellings and apartment houses..." all met the requirements of the *Dupont* test. STAR does not dispute that this is a market; it argues only that pay television services to apartment dwellers is the relevant "submarket".[5]

STAR supports its case with the argument that although it stipulated that potential customers perceive STAR's and Continental's services to be "reasonably interchangeable" with the offerings of movie theaters, and both are in competition with the wide variety of entertainment services enumerated above,[6] "there is no stipulation, and no findings, as to the degree of interchangeability or cross-elasticity of demand between any of the other alternatives and

---

**5.** The use of the term "submarket" is to be avoided; it adds only confusion to an already imprecise and complex endeavor. For antitrust purposes a product group or geographic area either meets the listed criteria, in which case it is a relevant market; or it does not, in which case it is irrelevant for purposes of analysis. No fiddling with nomenclature will change the analysis or result.

**6.** J.S. ¶¶ 36–38.

pay TV". Therefore, STAR argues, we may find pay television to be a "submarket". STAR fails to realize that it is exactly this failure to provide as evidence anything more than generalizations about the interchangeability and competition among the types of entertainment listed that is fatal to its submarket theory.

In *Dupont, supra,* the Supreme Court stated: "[i]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purpose make up that [relevant market]...." 351 U.S. at 394–95, 76 S.Ct. at 1007. One may attempt to clarify this definition with more precise economic terms by stating that the outer boundary of the relevant product market is reached, if one were to raise the price of the product or limit its volume of production, while demand held constant, and supply from other sources beyond the boundary could not be expected to enter promptly enough and in large enough quantities to restore the old price or volume.[7] "A 'relevant market', then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market."[8]

Plaintiff must show that because consumers do not perceive entertainment media to be reasonably interchangeable with pay television or because of some market limitation on the ability of the producers of reasonably interchangeable products to increase volume over the relevant demand range, that pay television is the relevant market. Having stipulated that consumers perceive movies shown in theaters to be "reasonably interchangeable" with the services offered by Continental and STAR, and having stipulated that the other media listed are in competition with Continental and STAR, the burden is on STAR to provide probative evidence to show that despite these facts, economic factors or consumers' perceptions limit the competitor's ability to compete—this STAR has not done. It argues only that proof of the "submarket" is found in the fact that Continental's contract excludes only other pay television companies. Whatever else this contractual provision might be, it is not sufficient proof that pay television is the relevant market—particularly when contrasted with the stipulations.

Similarly, STAR argues that apartments are a distinct "submarket" because of economic and competitive conditions distinct from those of single family residences, the most important of which is the intervention of the apartment owner or manager as limitor on access to pay TV by the consumer. Even were the Court to assume that economic and competitive conditions differ between single family dwellings (SFD's) and MDU's, STAR has failed to show that these differences result in an inability of competitors of Continental to provide substitute services at sufficient volume and price to impose limits on Continental's ability inordinately to influence price and supply.[9] To the contrary, the added expense and other problems of apartment installation of cable are a limit on Continental's ability to compete in the marketplace.

STAR's failure to meet its burden of proof is equally evident regarding the geographic market. STAR asserts that Henrico County is the relevant geographic market because: Continental began its construction there; Henrico was the most at-

---

7. L. Sullivan, *Handbook of the Law of Antitrust* § 12 at 41 (1977), quoted in *Comment, Relevant Geographic Market Delineation, supra* at 1158.

8. *Id.*

9. Continental's ability to persuade apartment owners to accept the exclusivity provision is nothing more or less than "price" in the sense that keeping their future options open has a definite economic value to the apartment owners and the value can be translated into dollars and cents. In this case we can say that the economic value or "price" to the owners is less than the cost of paying for wiring their buildings and less than the revenue that they anticipate might be lost when prospective tenants choose an apartment with cable service over their apartment complex without cable.

tractive area demographically; it was the "primary area of significant head to head competition" between STAR and Continental; and it is the area in which Continental's success was so remarkable as to create a relevant market.

The District Court, relying rightly on *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), held that Metropolitan Richmond, being "the 'area of effective competition' for the relevant services or products which are in the product market", was the relevant geographic market.

STAR's argument is without merit. At no time relevant to this lawsuit were the litigants not competing in marketing or operations both in Richmond and Henrico. STAR has presented no evidence limiting the market to Henrico; rather it agreed to joint stipulations which indicate that competitors of STAR and Continental in other media perceive Metropolitan Richmond to be one market.[10] STAR itself has subscribers in Henrico, Chesterfield and Hanover Counties as well as Richmond proper.

Using the rejected designation of product and geographic marketing, STAR's postulated measure of market foreclosure is the percentage of MDU's in Henrico under contract with Continental. Under this selective formula Continental might be seen to have a substantial market power,[11] but the District Court found market foreclosure to be only about 8 per cent. The Court's figure represents the number of MDU's under contract to Continental, about 19,500, over the total number of dwelling units, single and multiple, in Metropolitan Richmond. Both measures are misleading. Having found that the relevant market includes movies in theaters, broadcast television, sporting events, concerts, etc. in all of Metropolitan Richmond, the District Court did not have the information necessary to measure the degree of market foreclosure. The number of households can tell one nothing about the market power of STAR

and Continental relative to their non-broadcast competitors. This complete absence of market measure alone should have entitled Continental to judgment in its favor.

Instead of ending the inquiry upon the failure of STAR to provide the necessary evidence, the District Court chose to examine the effect on competition using Continental's geographic market and a modified version of STAR's product market. We are satisfied that although the Court below need not have analyzed the question in this manner, having done so using measures of the product and geographic markets more favorable to STAR than those which it felt to be correct, its calculation—though worrisomely imprecise—is correct in its result. Continental's having chosen to service MDU's as well as SFD's increased competition in the short run by giving apartment owners a choice which they would otherwise have been denied. The fact that apartment owners or managers chose Continental's service over STAR's, when each was a new entrant into the market—even after the economic discounting of the benefits from Continental's service which would have followed from the exclusivity provision, proves only that apartment owners and managers perceived Continental's to be the superior service.

As regards the effect on future competition, no reliable estimate as to the future size of the pay television share of the entertainment market in Richmond is in the record. Because the industry is new to Richmond, the District Court would not have been justified in analyzing the effect on competition based on an assumption of a constant market over time. *Contrast, Tampa Electric,* 365 U.S. at 330–35, 81 S.Ct. at 629–32. Nor was it justified in assuming that the market may include every household in Metropolitan Richmond. However, the provision at issue is no longer being used by Continental, which means that the market foreclosure on June 1980 is the maximum foreclosure. We cannot say that

---

**10.** J.S. ¶¶ 40, 41, 42, 44, 45, 46.

**11.** STAR uses the figure of 90 per cent; even granting STAR its market definitions, this number is open to serious question.

foreclosure of 8 per cent of the households in Metropolitan Richmond to STAR for a period of no more than fourteen months between March 1979 and June 1980 will substantially lessen competition in either the pay television industry or the entertainment industry in Metropolitan Richmond in the future. *See, Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1952). Judgment is therefore properly given to Continental.

### IV.

STAR's Sherman Act § 2 claim meets the same fate as its § 1 claim. Continental has not been shown to have anything resembling monopoly power in any relevant market. Having failed to show that Continental had either the probability of achieving monopoly power, *American Tobacco v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946), or the intent to achieve it,[12] *United States v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948), STAR has failed to make out a claim for attempt to monopolize.[13]

### V.

The District Court treated STAR's Clayton Act § 3 claim differently from the Sherman Act claims, granting Continental a dismissal. The District Court held that Continental offers a service, and therefore does not come within the purview of the Clayton Act, which covers only "goods, wares, merchandise, machinery, supplies or other commodities." *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55, 64 (4th Cir.1969).

The Court properly examined the transaction in order to determine its dominant nature, and found the dominant nature to be broadcasting—a service. *Tri-State Broadcasting Co. v. United Press International, Inc.,* 369 F.2d 268 (5th Cir.1966). We agree. The transmission equipment is incidental to the programming—it is the programming that is by far the chief concern of all parties to the transaction.[14] *E.g., Aviation Specialties, Inc. v. United Technologies Corp.,* 568 F.2d 1186 (5th Cir.1978); *Kennedy Ticket Service v. Ticketron, Inc.,* 342 F.Supp. 922 (E.D.Pa.1972).

The judgment below is

AFFIRMED.

---

**12.** STAR stipulated that Continental's decision was a good faith business judgment. J.S. ¶¶ 86–90. Such a stipulation is fatal to the finding of the requisite specific intent to monopolize. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1952).

**13.** The claims under Virginia Law for restraint of trade, *Va.Code* § 59.1–9.5 (1950) and monopolization *Va.Code* § 59.1–9.6 (1950) fail under the same reasoning which is properly ap-

plied under Virginia statute. *See, Va.Code* § 59.1–9.17 (1950).

**14.** For the same reason, that what is offered is a service, not two products: cable television broadcasting equipment and cable television programming, STAR's assertion that the exclusivity provision constitutes an illegal tying agreement fails. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).