**THOMPSON EVERETT, INC., Plaintiff,**

v.

**NATIONAL CABLE ADVERTISING, L.P., et al., Defendants.**

Civ. A. No. 3:93CV452.

United States District Court,
E.D. Virginia,
Richmond Division.

April 18, 1994.

Stephen Earl Baril, John Luther Walker, III, Curtis McKinley Hairston, Jr., Dana Duane McDaniel, Glen Andrew Lea, Williams, Mullen, Christian & Dobbins, Richmond, VA, for Thompson Everett, Inc.

Charles Manley Allen, Jr., Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, VA, Daniel G. Swanson, Julia A. Dahlberg, Robert H. Wright, Gibson, Dunn & Crutcher, Washington, DC, for National Cable Advertising, Inc.

Stephen Atherton Northup, Robert Dale Seabolt, Mays & Valentine, Richmond, VA, Yvonne S. Quinn, Sullivan & Cromwell, New York City, for Cable Networks, Inc.

Thomas Edward Spahn, McGuire, Woods, Battle & Boothe, Richmond, VA, Gerald J. Fields, Battle Fowler, New York City, for Cable Media Corp.

Charles Manley Allen, Jr., David Ernest Boelzner, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, VA, Daniel G. Swanson, Julia A. Dahlberg, Robert H. Wright, Gibson, Dunn & Crutcher, Washington, DC, for National Cable Advertising, L.P.

Charles Manley Allen, Jr., Daniel G. Swanson, Julia A. Dahlberg, Gibson, Dunn & Crutcher, Washington, DC, for Cox Cable Communications.

### *MEMORANDUM OPINION*

SPENCER, District Judge.

THIS MATTER comes before the Court on the defendants' Joint Motion for Summary Judgment. For the reasons stated herein, the defendants' motion will be GRANTED.

### I.

Plaintiff Thompson Everett, Inc. ("TE"), is a corporation organized in Virginia with its principal place of business located in Glen Allen, Virginia. TE claims that it is a re-

gional, independent cable television advertising representative and a full service advertising agency with affiliated offices in North Palm Beach, Florida and Louisville, Kentucky. The company is engaged in the business of buying broadcast, cable, radio, and print media advertising time for its clients, and offers consulting and television market research services to them as well.

The defendants are representatives of cable television systems ("cable rep firms") that sell advertising time ("spots") to national advertisers. The defendants seek out the advertisers, who are themselves represented by advertising agencies, and attempt to convince those agencies to buy time on the cable systems. The defendants are the three largest cable rep firms in the United States.

Defendant National Cable Advertising, L.P. ("NCA"), is a Massachusetts limited partnership with its principal place of business located in Boston, Massachusetts. NCA is a national cable rep firm that is owned by four of the largest national cable system owners and operators in the United States: Continental Cablevision, Inc., Comcast Cable Corp., Cox Cable Communications, and Time Warner Cable.

Defendant Cable Networks, Inc. ("CNI"), is a Delaware corporation with its principal place of business located in New York. CNI is a national cable rep firm owned by Cablevision Systems Corp., a cable system owner and operator.

Defendant Cable Media Corporation ("CMC") is a Michigan corporation with its principal place of business located in Farmington Hills, Michigan. CMC is a national cable rep firm owned by Katz Communications, Inc., a network television rep firm, and Barrett J. Harrison, the president of CMC.

The plaintiff filed this lawsuit to challenge the defendants' exclusive contractual arrangements with their represented cable systems ("exclusive rep contracts"), in which the cable system operator commits to use the cable rep firm exclusively in exchange for the cable rep firm's agreement to make sales of advertising time on the cable system's behalf. Plaintiff raises various antitrust claims and supplemental common law business tort claims.[1] In turn, all defendants have filed counterclaims against Thompson Everett, alleging tortious interference with contractual relations.

## II.

Summary judgment is proper if, viewed in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985). Federal Rule of Civil Procedure 56(c) requires that the court enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The essence of the inquiry that the court must make is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91

---

1. Counts I and II allege a horizontal conspiracy to fix prices, divide markets, exclude competition, coerce TE through exclusive contracts, in violation of 15 U.S.C. § 1. Counts III and IV claim the defendants entered into vertical conspiracies with cable system operators to restrain trade and coerce TE's clients, also in violation of 15 U.S.C. § 1. Count V claims the defendants monopolized access to local cable systems, in violation of 15 U.S.C. § 2. Counts VI and VII assert that the preceding actions constitute violations of the Virginia antitrust statutes, Va.Code

§§ 59.1–9.5, –9.6, and business conspiracy statutes, Va.Code §§ 18.2–499, –500. Count VIII claims the defendants interfered with TE's business relations. Finally, the remaining counts allege that the defendants made defamatory statements about TE in violation of state law and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125.

Although TE also claimed at the summary judgment stage that it made a "tying" claim in its Amended Complaint, the pleading obviously does not give notice of such a claim.

L.Ed.2d 202 (1986). Summary judgment is proper "if the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510.

■■■ "[S]ummary judgment is an important tool for dealing with antitrust cases." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992). In fact, "[t]he very nature of antitrust litigation encourages summary disposition of such cases when permissible." *Id.* (quoting *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir.1988)). As the Supreme Court stated in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), a party opposing summary judgment in the antitrust context "must do more than simply show that there is some metaphysical doubt as to the material facts . . .; the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial.**'" *Id.* at 586–87, 106 S.Ct. at 1356; *see also Capital Imaging Assocs. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

### III.

The defendants' main argument in support of their motion for summary judgment focuses on the Plaintiff's role in the advertising business. To consider this argument, some background material on the industry will be helpful.

In addition to the actual buyers and sellers of advertising, the advertising business includes a variety of entities with roles in facilitating the purchase or sale of the advertisements. These entities generally fit either of two categories: (i) buyer representatives that create and purchase advertising for advertisers, and (ii) seller representatives that sell ads for the different advertising media. The buyer reps include "advertising agencies," such as full service advertising agencies, "creative boutiques," and media buying services. (Joseph Michael Everett Tr. 96–108; Peter J. Moran Tr. 80–81.) The seller reps include "representative firms," such as radio representatives, cable television representatives and broadcast television representatives. (*See* Juliane Arena Tr. 183–84; Jane F. Berry Tr. 69–71.)

Although some advertisers create their own advertisements and then purchase their advertising directly from the desired media, many hire an agency to perform this task. A "full-service" agency typically studies an advertiser's product, creates a strategy for advertising the product, designs ads to implement that approach, selects the media to distribute the ads, and then negotiates and purchases the time or space from the selected media. (*See* Everett Tr. 97–100; Jon Sanders Tr. 131–33; Bunny Tiner Tr. 6; John R. Klein Tr. 30–31.)

Over time, two general types of advertising agencies have evolved. "Creative boutiques" concentrate on designing an advertising approach and creating and producing the advertisements but do not actually select or purchase the advertising media. (*See* Moran Tr. 80–81.) In contrast, "media buying services" focus upon selecting the mix of advertising to be used in an advertising campaign that has been created and designed elsewhere and upon negotiating with and purchasing advertising from the various media. (Everett Tr. 101, 103–104; Robert Fennimore Tr. 71; Susanne Moore Tr. 48; Kay Franks Tr. 87–88; Sanders Tr. 192–93; Robert Williams Tr. 362.) Advertising agencies, whether full service agencies, creative boutiques, or media buying services, are all hired by the advertiser and thus work for and represent the interests of that advertiser. (Everett Tr. 97–98; Fennimore Tr. 71; Williams Tr. 362, 795; Sanders Tr. 213–14.)

Most advertising media retain sales staffs to sell ads to advertisers or advertising agencies. Most media have in-house advertising staffs that focus on sales to advertisers in the immediately surrounding geographic areas, and arrange for nationally based representatives to sell advertising to national and regional advertisers on their behalf. (*See, e.g.*, Albin J. Seethaler Tr. 52.) These representatives are agents of the media and act as an extension of the media's own sales staff. (Moore Tr. 79–80, 85; Klein Tr. 49.) They

traditionally have been paid a percentage commission based on the amount of advertising revenues they generate on behalf the cable system operator. (Barrett J. Harrison Tr. 52–53.)

The instant litigation focuses on a particular advertising medium—spot cable. Spot cable is advertising time sold by cable television operators throughout the country on the cable programming that they deliver to the homes of their subscribers. (Moran Aff. ¶ 3; Harrison Decl. ¶ 3.) Cable systems sell most of their spot cable advertising time through their own sales staffs to local advertisers, but a portion of the systems' available spot cable time is sold to national and regional advertisers. Thompson Everett now challenges the method in which cable rep firms sell spot cable to national and regional advertisers.

The defendants have attempted to characterize cable rep firms as "quite simply sales people for hire." They argue that cable rep firms are mere extensions of the cable systems' sales forces, and that their job is to maximize the advertising revenues of the systems that hire them. (Defts.Mem. 7.) Their responsibilities vary. Some cable rep firms, referred to as "turnkey operations," are hired as a total substitute for the cable operator's own internal sales staff. (Defts. Mem. 8.) Other representative firms handle only sales to national and regional advertisers, while the cable operator employs its own internal staff to sell to local advertisers. (Id.)

The defendants claim that they compete "aggressively and regularly with one another for the right to be, or to replace one another as, exclusive sales agents for cable television systems and interconnects[2] pursuant to exclusive representation agreements." (Defts.Mem. 13.) According to defendants, these representation agreements are short-term contracts by which the exclusive representative promises to use its best efforts to sell advertising to national and regional ad-

vertisers. The cable television system or interconnect, in turn, retains the right to control prices and reject sales that are unacceptable. (Defts.Mem. 14.) The contracts also contain performance standards that allow the cable systems to terminate the agreement if the standards are not met. (Id.) The defendants assert that a variety of legitimate business reasons exist to support the practice of forming exclusive contracts, such as tradition, convenience, efficiency, and to prevent "free riding."[3]

Given this background, the defendants argue that TE is not a true cable rep firm, but is instead a "media buying service." According to defendants, there is no question that TE works for and wants to serve the interests of advertisers and advertising agencies, not cable operators and interconnects.

While accepting the defendants' general description of the advertising business, TE disagrees about what produced the structure of the industry. First, TE argues that defendants' own deposition testimony contradicts their argument that exclusive contracts are motivated by a concern about "free riders." For example, CMC's president stated that CMC does not make extensive marketing efforts:

> We don't go in and pitch our product to be honest with you. I mean, we get a phone call and they're buying ten markets ... and it's a case of just fulfilling their [order].

(TE Exh. 11 at 60.) Second, as it explains more completely in its Motion for Partial Summary Judgment, TE argues that the defendants have misled advertisers into believing they should not do business with TE because TE does not have exclusive contracts with cable systems.

Finally, and most importantly, TE maintains that it is a "cable rep firm," and not merely a "media buying service." TE asserts that the defendants' own evidence belies any notion that TE is a media buying

2. An "interconnect" is a group of cable systems located within a given geographic area that have entered into an arrangement enabling advertisers to purchase advertising time on the entire group of systems in one purchase. (Defts.Mem. 7, at note 3.)

3. The defendants claim that "exclusive sales agent arrangements are necessary to support defendants' considerable investments in market and demographic research and in technological innovations that facilitate the actual placement of spot cable advertising." (Defts.Mem. 17.)

service. For example, an internal CNI document identifies TE as one of five independent rep firms and states that TE is a "fairly well-respected regional firm." (TE Exh. 20 at 19–20.) Likewise, other internal documents from NCA identify TE as a cable rep firm. (TE Exh. 47, at N208303.)

TE states that "[i]t is not surprising that defendants view TE as a cable rep firm (and a competitor). TE performs the same functions as defendants. Like defendants, TE brings advertising revenue to cable systems, and historically, cable systems have paid TE commissions." (TE Mem. in Opp. at 14 (citing TE Exh. 49 at 73, 74, 113–116, 169, and TE Exh. 50 at 247–48).) TE argues that defendants' have concocted a description of TE as a "media buyer" because:

> [I]n those rare but increasing instances in which a cable system refuses to commission TE, TE tries to negotiate a spread between the price the agency is willing to pay for a spot and the price the cable system charges to create a profit on the transaction. That TE on occasion negotiates a profit and that it negotiates the best rate it can for advertising agencies does not make TE a media buyer and certainly does not mean that TE does not compete with the defendants for ad agency business. TE is, in fact, an independent cable rep firm that competes with defendants and other independent rep firms such as CTV, for limited national spot cable advertising dollars.

(TE Mem. in Opp. at 15–16 (citations omitted).)

## IV.

■ An antitrust plaintiff must prove "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)).

The Supreme Court has stated that:

> injury, although causally related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti-competitive aspect of the practice under scrutiny, "since '[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition."

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–110, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986)). Although the existence of "antitrust injury" also helps courts determine whether a plaintiff has standing, the absence of "antitrust injury" is alone fatal. *See id.; Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir.1987) (factor in determining antitrust standing is relationship of injury alleged to the forms of injury Congress targeted).

■ Exclusive distributorship arrangements [4] do not violate the antitrust laws un-

---

4. The parties have referred to the spot cable contracts as "exclusive dealing" contracts. Such a categorization is only partly accurate. An "exclusive dealing" contract is "an agreement by a distributor to refrain from dealing in goods of a competitor." ABA Antitrust Section, *Antitrust Law Developments*, 117 n. 631 (3d ed. 1992). On the other hand, "[a]n exclusive distributorship typically provides a distributor with the right to be the exclusive outlet for a manufacturer's products or services in a given geographic area. It restricts the manufacturer from competing with a distributor by preventing the manufacturer from establishing its own sales outlet in the area as well as from appointing or selling to other distributors located in the area." *Id.* at 117; *see also* Steuer, Richard M., *Exclusive Dealing in Distribution*, 69 Cornell L.Rev. 101, 102 n. 4 (1983) ("Exclusive [distributorships] do not in themselves limit the distributors, although they are frequently coupled with territorial restraints to keep the dealers out of each other's exclusive territories.").

The contracts at issue in this case are between cable systems and cable rep firms in which the systems appoint the rep firms as exclusive representatives for national and regional advertising directed to the cable systems' respective geo-

less they foreclose competition in the relevant market. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 45, 97 S.Ct. 2549, 2555, 53 L.Ed.2d 568 (1977). Thus, only a plaintiff qualifying as a competitor or consumer in that market could suffer antitrust injury from an unlawful exclusive distributorship arrangement, because only those two categories of plaintiffs could be injured by such a restraint on competition. *See id.; see also White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104 (4th Cir.1987) (doctor could not prevail on monopolization claim against hospital because doctor was neither a competitor nor consumer in the relevant market); *Ficker v. Chesapeake & Potomac Tel. Co.,* 596 F.Supp. 900, 904 (D.Md.1984) (whether plaintiff is consumer or competitor in market is frequently dispositive).

▮ The plaintiff in an antitrust case bears the burden of proof of the relevant market. *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 714 F.2d 351 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). The relevant product market is composed of "those products or services which are 'reasonably interchangeable by consumers for the same purposes.' " *Id.* at 355 (quoting *United States v. E.I. Dupont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956)).

A problem with defining the product market in this case is that the cable systems possess legal monopolies in their geographic areas of service. Despite this fact, they must compete with other media for advertising revenue, such as broadcast television, radio, newspapers, etc. This competition among the different media could easily qualify as "interbrand" competition even though the cable systems have a monopoly on the spot cable "brand" of advertising. The Fourth

Circuit considered a similar issue in *Satellite Television.* The court explained the *Dupont* standard by stating that

> [T]he outer boundary of the relevant product market is reached, if one were to raise the price of the product or limit its volume of production, while demand held constant, and supply from other sources beyond the boundary could not be expected to enter promptly enough and in large enough quantities to restore the old price or volume. "A 'relevant market', then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market."

*Satellite Television,* 714 F.2d at 356 (footnotes omitted).

In *Satellite Television,* one cable company sued another on various antitrust claims, alleging that the defendant had entered into unlawful exclusive dealing contracts with apartment complexes in the metropolitan Richmond area. The Fourth Circuit upheld the district court's conclusion that the product market included "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses for customers who live in single-family dwellings and apartment houses ..." *Id.* at 355. Although the plaintiff in that case stipulated that movies shown in theaters were "reasonably interchangeable" with the services offered (in the early–1980s) by cable television, the court stated that the plaintiff cable company might still recover by showing "economic factors or consumers' perceptions limit the [movie theater's] ability to compete ..." *Id.* at 356. However, TE has not raised such an argument in this case.

▮ Even assuming that the relevant market should be confined analytically to

graphic markets. Regardless of which label is used, the ultimate question is whether the contracts unreasonably restrain competition. *See, e.g., Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985)

(every commercial agreement restrains trade; key is whether restraint is reasonable).

However, the term "exclusive distributorship" best describes the arrangements in this case, because the rep firms commonly act as a substi-

spot cable advertising in particular,[5] TE must prove that it is a competitor of the defendants within the spot cable market. Evidence from TE's corporate officers dispels any notion that TE actually competes with the defendants as a cable rep firm. The evidence instead demonstrates that TE is a "media buying service" whose primary allegiance is to the advertisers—not to the cable systems with which it seeks to do business. The deposition testimony from TE's chief operations officer, Amy Venhuizen, is illustrative of TE's role in the spot cable market:

Q: You don't like [exclusive rep contracts] because they create a loyalty to the cable side of the business; isn't that right?

A: We don't sign exclusivities because we do other things.

Q: Could you explain what those other things are?

A: A client may think they are interested in spot cable when, in fact, it would be more efficient to go network cable.

It is my opinion, if Thompson Everett doesn't sign an exclusive contract with a cable system, then we can meet the agency's needs by flipping the buy to network.

Q: So, in other words, you want—you don't want to feel obligated to sell spot cable on behalf of any cable operator; is that correct?

A: I want to buy spot cable for the client when it meets the client's needs.

Q: You want to serve the interests of the client, which I understand is the advertiser; right?

A: That's correct.

Q: You want to serve the interests of the advertiser; is that correct?

A: That's correct.

Q: If the interests of the advertiser are inconsistent with selling spot cable for a particular cable operator, you're going to do what is in the advertiser's interests, not what is in the interests of the cable operator; is that correct?

A: That's correct.

(Amy B. Venhuizen Tr. 364–65.)

In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the plaintiff union alleged that a multiemployer bargaining association and its members coerced third parties and some of the association's members to do business with non-union firms. As part of a general inquiry into whether the plaintiff union had antitrust standing, the Court determined that the union had not suffered antitrust injury because it was neither a competitor nor a consumer in the relevant market. *See id.* at 539–40, 103 S.Ct. at 909. Central to this conclusion was the fact that the union, "in its capacity as a bargaining representative, will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains." *Id.* at 540, 103 S.Ct. at 909. Along these lines, the Court noted that the union's "labor-market interests seem to predominate ..." *Id.*

■ Responding to the defendants' description of its status in the spot cable market, TE contends that: (1) the defendants viewed TE as a competitor; (2) TE brings advertising revenue to the cable systems; and (3) cable systems have paid TE commissions. Accepting these disputed issues of fact as true for the purpose of the summary judgment analysis, the evidence offered still demonstrates that TE is not a competitor of the defendants in the spot cable market. In determining whether the Plaintiff is a competitor, the key question is not what labels the parties use to describe their business activities. Instead, as *Associated General Contractors* makes clear, the Court must focus on how the business actually operates in

tute or extension of the cable systems' internal sales staffs.

5. In the present case, Thompson Everett has not offered any evidence that the product market should be confined to the "spot cable" industry instead of the advertising industry. It is clear that spot cable competes with broadcast television for advertising dollars, but most courts allow the fact-finder to determine the relevant market. *See Storer Cable Communications v. City of Montgomery,* 826 F.Supp. 1338 (M.D.Ala.1993) (relevant market usually determined only after fact-finding has been conducted). For summary judgment purposes, the Court will consider the effect of exclusive contracts on the narrow spot cable market as well.

the marketplace. *See id.* at 539–40, 103 S.Ct. at 909.

TE's own officers testified during depositions that upon receiving an order from an advertiser, TE will serve the advertiser client by determining the best media vehicle for the advertiser's message. If TE decides that spot cable advertising will not serve the client's needs effectively, TE will buy advertising time from other media, such as broadcast television. (*See* Venhuizen Tr. 364–65, 419; Everett Tr. 109; *see also* Franks Tr. 87.) As was the case in *Associated General Contractors*, the antitrust plaintiff's interests in this case are anti-competitive. *See Associated General Contractors*, 459 U.S. at 539, 103 S.Ct. at 909. Forcing the defendants to do business in the same manner that TE conducts its operations would endanger the burgeoning spot cable advertising industry. Cable system operators would be forced to rely on firms with loyalty to the advertiser to sell their spot cable time. Inevitably, cable systems would have no alternative to placing greater reliance on their internal sales staffs to sell time, with a corresponding loss in efficiency.

Although TE has produced evidence that it brings revenue to the cable systems, that evidence equally demonstrates that it diverts revenue from the cable systems. In the event that exclusive rep contracts in the spot cable industry result in artificially high advertising prices,[6] there is no reason why the advertisers themselves could not challenge the practice as consumers. Similarly, an independent cable rep firm closed out of bidding for exclusive contracts by an unlawful conspiracy could also seek recourse as a competitor.[7]

Therefore, TE has not offered evidence sufficient to show that it has suffered an "antitrust injury."[8] Accordingly, summary

**6.** It is unclear whether TE would suffer at all from artificially high prices, because its commissions would increase as a direct consequence.

**7.** This does not include TE. It has chosen not to compete for those contracts because of the conflict of interest those arrangements would create with its advertiser clients. (Venhuizen Tr. 364–65.)

judgment must be granted with respect to Counts I, II, III, IV, V and VI.

## V.

■ Even if TE had met its burden with respect to the antitrust injury requirement, summary judgment would still be appropriate on the substantive issues raised in this case.

■ Section 1 of the Sherman Act states that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1988). There are three basic elements of a Section 1 violation: "(1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate and foreign commerce." ABA Antitrust Section, *supra,* 2 (and cases cited). TE has alleged that the exclusive rep contracts constitute unlawful horizontal and vertical conspiracies, in violation of Section 1.

■ To survive a motion for summary judgment, a plaintiff asserting a § 1 claim must present evidence "'that tends to exclude the possibility' that the alleged conspirators acted independently. [The plaintiff], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356 (1986) (citations omitted). Stated yet another way, "there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective."

**8.** TE argues, in the alternative, that its claims should survive summary judgment even if it is deemed not to compete with the defendants, citing *Engine Specialties, Inc. v. Bombardier, Ltd.,* 605 F.2d 1 (1st Cir.1979), *cert. denied* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980). However, *Engine Specialties* cannot rescue TE's claims. The plaintiff in that case actually competed with the defendant pursuant to its own exclusive distributorship contract. *See id.* at 13.

*Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984).

█ Because proving a conspiracy is difficult without direct evidence, the Supreme Court has allowed courts to infer the existence of a conspiracy based on several factors. First, courts may consider a pattern of uniform conduct among competitors, which is commonly referred to as "conscious parallelism." *See* ABA Antitrust Section, *supra,* at 5. In addition, courts look at various "plus factors," such as an opportunity for collusion, evidence showing the parties would benefit only through concerted action, and evidence showing legitimate business reasons should have motivated independent action. *See id.* at 9–10 (citations omitted).

Although the Plaintiff has offered evidence of frequent business contacts among the defendants, joint presentations to industry trade groups, and strategic plans that discuss the need for organizing the spot cable market, much of the events giving rise to the alleged conspiracy occurred only after the defendants began using exclusive contracts. In fact, the defendants evidence proves that such contracts are used throughout the advertising industry, and that they have used these agreements since the inception of their respective businesses. Therefore, there is no genuine issue of material fact supporting the existence of a unlawful horizontal agreement among the defendants.

█ Furthermore, once a conspiracy has been proved, most business combinations are judged under a "rule of reason." This involves an in-depth market analysis to determine whether the combination in question unreasonably restrains trade.[9] Under this inquiry, the key question is whether the restraint "is one that promotes competition or one that suppresses competition." *National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *see also Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); ABA Antitrust Section, *supra,* at 42. Despite this customary analysis, certain restraints have been held to constitute a *per se* violation of the Sherman Act without necessitating a detailed consideration of the reasonableness of the impact on competition.[10]

█ As the defendants contend, the undisputed facts show that the defendants have entered independently into a series of vertical, exclusive distributorship contracts with the cable system operators.[11] Generally, most vertical, nonprice restrictions are judged under the rule of reason. *Blanton Enterprises, Inc. v. Burger King Corp.,* 680 F.Supp. 753 (D.S.C.1988). The federal courts have applied the rule of reason analy-

---

**9.** Justice Brandeis stated the rule of reason this way in *Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 244.

**10.** As Justice Black stated:

[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

**11.** The contracts between the cable operators and the representative firms create an agency relationship. Under the intra-corporate conspiracy doctrine, a corporation cannot conspire with its own agents. *See Buschi v. Kirven,* 775 F.2d 1240, 1241–552 (4th Cir.1985).

sis in the vast majority of exclusive distributorship cases. *See* ABA Antitrust Section, *supra,* at 123 n. 666. "In analyzing the effect of exclusive distributorships on competition, courts have considered such factors as the strength of interbrand competition, the duration of the exclusive distributorship, and the geographic extent of the distributorship." ABA Antitrust Section, *supra,* at 118–119 (and cases cited). The impact of each of these considerations will be examined in turn.

▮ As discussed earlier, spot cable competes with other media, such as broadcast television, for advertising dollars. Even if the product market is confined more narrowly to the spot cable market itself, the evidence shows that the defendant cable rep firms compete for exclusive contracts. (*See* Declaration of Robert D. Williams at ¶ 15; Declaration of Barrett J. Harrison at ¶ 24; Affidavit of Peter J. Moran at ¶ 14 (noting competition between NCA and CNI over right to represent Cable AdNet of Pittsburgh, Inc. and TCI Cablevision of Central Connecticut); Everett Tr. at 581.) Such competition will inevitably encourage the defendants to reduce their commissions or to offer additional services to lure business away from the other cable rep firms.

This competition is enhanced by the nature and scope of the contracts themselves. CMC's contracts typically allow the cable system to terminate the contract at any time upon one year's notice. (*See* Albin J. Seethaler Tr. at 42; Harrison Decl. at ¶ 15.) CNI has entered into contracts with termination provisions that range from 30 days (Moran Aff.Exh. A at ¶ 23.) to five years (Moran Aff.Exh. C at ¶ 8(a).). NCA's contracts typically last for one to three years. (*See* Williams Decl.Exhs. C at ¶ 1, D at ¶ B(6), E at 3, F at ¶ 8, G at ¶ 9, and H.) Many of these contracts also allow the parties to terminate the arrangement early if revenue goals are not met, or if the cable system gives reasonable notice. (*See, e.g.* Williams Decl.Exh. D at ¶ 9; Moran Aff.Exh. C at ¶ 8(b).)

The geographic scope of the exclusive rep agreements also varies widely. CMC's contracts provide that national spot cable advertising time may be purchased from the system only through CMC. (Harrison Decl. ¶ 16.) The majority of CNI's agreements also are national in scope, but some of its contracts appoint CNI as an exclusive representative only in cities where CNI maintains an office or regularly does business. (*See* Moran Aff.Exhs. A, B and C.) The territorial limitations of NCA's exclusive rep contracts vary, with the clients adopting national, regional and local approaches. (Williams Decl. ¶¶ 7–11, and Exhs. B, D, E, F and G.)

The Supreme Court's decision in *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), suggests that, under these facts, the vertical, nonprice restrictions in this case are manifestly reasonable. The Court there, which was faced with a territorial restraint, based its conclusion on the fact that vertical agreements commonly have both pro-competitive and anti-competitive effects.

Vertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product competing for the business of a given group of buyers. Location restrictions have this effect because of practical constraints on the effective marketing area of retail outlets. Although intrabrand competition may be reduced, the ability of retailers to exploit the resulting market may be limited both by the ability of consumers to travel to other franchised locations and, perhaps more importantly, to purchase the competing products of other manufacturers. . . .

Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These "redeeming virtues" are implicit in every decision sustaining vertical restrictions under the rule of reason. Economists have identified a number of ways in which manufacturers can use such restrictions to compete more effectively against other manufacturers. For example, new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of

products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products....

*Sylvania*, 433 U.S. at 54–55, 97 S.Ct. at 2560 (citations omitted).

The *Sylvania* Court's recognition of the "efficiencies" produced by vertical, nonprice restrictions applies with equal force in the present case. As the defendants contend, traditional antitrust concerns such as "free riding" have prompted the use of exclusive contracts throughout spot cable. The evidence has also demonstrated that such contracts have attracted investment capital to the industry, and have produced competition within the spot cable industry and with other advertising vehicles such as broadcast television. Finally, TE presents no evidence which suggests that the exclusive contracts have resulted in output restriction. *Cf. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (output restriction factor in determining whether restraint is unlawful *per se*).

■ In short, the Plaintiff would not be able to prove at trial that exclusive representation agreements have had a substantial anticompetitive effect. To the extent that TE's claims are premised on the theory that

such contracts violate the antitrust laws, summary judgment must be granted.[12]

## VI.

■ Count VIII of TE's Amended Complaint alleges a claim for tortious interference with contractual relations and business expectations. Under section 773 of the Restatement (Second) of Torts:

One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Restatement (2d) of Torts § 773 (1979).

The evidence submitted to the Court shows that the defendants acted in good faith to protect their contractual rights. None of the evidence presented shows that the defendants used wrongful means to enforce those agreements. Therefore, summary judgment in the defendants' favor is appropriate.

## VII.

■ TE's remaining claims concern alleged common law defamation and "commercial defamation" under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[13] Both

---

12. Thus, summary judgment also will be granted in favor of the defendants on TE's monopolization claim under Section 2 of the Sherman Act, and on its Virginia antitrust claims. *See White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir.1987) (plaintiff must show jury could find defendant had no valid business reason or concern for efficiency); *Satellite Television*, 714 F.2d at 358 n. 13 (reasoning applicable to Sherman Act claims governs Virginia antitrust statutes). For the same reasons, summary judgment will be granted for the defendants on the Virginia business conspiracy claims. Such claims require proof that the conspiracy had the purpose of "willfully and maliciously injuring" the plaintiff in his business, which could not be proved at trial on the facts submitted to this Court. Va. Code Ann. §§ 18.2–499,—500; *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984).

13. That statute provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

claims are based on the assumption that exclusivity in the spot cable advertising business violates the antitrust laws. In light of the Court's ruling on that issue, none of the defendants' statements could be held defamatory under state law or federal law.

TE points out that the Lanham Act was recently amended to include commercial defamation claims. Previously, false representations about the plaintiff's product or service were not considered actionable. *See Monoflo International, Inc. v. Sahm,* 726 F.Supp. 121, 126 n. 10 (E.D.Va.1989). The amendments extend the act to cover commercial defamation against any person. *See id.* (citing 15 U.S.C. § 1125).

However, the amendments do not save TE's Lanham Act claim. In *Monoflo International,* Judge Ellis ruled that the defendant's misrepresentations about the status of its relationship with the plaintiff did not trigger the Lanham Act. In an attempt to obtain Monoflo's product, the German corporate defendant sent a letter to Monoflo's distributor claiming that it was Monoflo's exclusive European sales agent. *Id.* at 123. The court ruled that the Lanham Act "reaches only misrepresentations that tend falsely to represent some aspect of a product or service; it does not reach, as here, misrepresentations essentially unconnected to a product or service. In misrepresenting its status as Monoflo's exclusive European sales agent, [the defendant] said nothing that would tend falsely to represent anything about the quality, nature, or characteristic of any product or service." *Id.*

Although TE claims the defendants misrepresented its capability to deliver spot advertising time to its clients, the real dispute concerned only TE's status. *Monoflo* makes it clear that this is not actionable under the Lanham Act, even as amended.

## VIII.

For the reasons hereinbefore stated, the defendants' Joint Motion for Summary Judgment will be GRANTED. An appropriate Order shall issue.