671 A.2d 716

Kenneth KAPLAN, on Behalf of Himself and
all Others Similarly Situated, Appellant,

v.

CABLEVISION OF PA, INC. and its Successor in Interest,
Suburban Cable TV Co., Inc., Appellees.

Superior Court of Pennsylvania.

Argued Nov. 2, 1995.

Filed Feb. 5, 1996.

308

Michael J. Boni, Philadelphia, and Michael D. Donovan, Haverford, for appellant.

Geoffrey L. Beauchamp, Norristown, for Cablevision of PA, appellee.

Alexander Kerr, Philadelphia, for Suburban Cable TV, appellee.

Before ROWLEY, President Judge, and TAMILIA, KELLY, POPOVICH, HUDOCK, FORD ELLIOTT, SAYLOR, HESTER and BROSKY, JJ.

HUDOCK Judge:

If a cable company fails to voluntarily rebate fees for periods of cable interruption, does this constitute an unfair or deceptive practice under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. section 201–1 *et seq.*, when the cable subscription agreement does not expressly obligate the cable company to provide continuous, uninterrupted service? We find that it does not and hence affirm the trial court's November 2, 1994 order which granted Cablevision of PA, Inc.'s and Suburban Cable TV Co., Inc.'s preliminary objections in the nature of a demurrer and dismissed Kenneth Kaplan's amended class action complaint with prejudice.

On September 8, 1993, Kenneth Kaplan filed a class action complaint against Cablevision of PA, Inc. and its successor in interest, Suburban Cable TV Co., Inc., on behalf of himself and all "current and former subscribers to Cablevision's cable television services." [1] Kaplan alleged that Suburban and Cablevision (collectively referred to as the "Cable Companies") failed to provide continuous, uninterrupted cable service and failed to provide credit or notice of how to obtain credit for periods of service interruptions. Kaplan complained that the Cable Companies deliberately confused and misled their subscribers by not voluntarily providing rebates for periods of cable interruptions and by failing to inform them of their right to such rebates. Kaplan alleged that this conduct violated the UTPCPL, constituted a breach of the contractual duty of good faith and fair dealing and a breach of the implied warranty of merchantability allegedly contained in the subscription agreement. Kaplan sought money damages, a rebate for all periods when the cable services were interrupted, a declaratory judgment that the Cable Companies' practices were unlawful, and an injunction prohibiting the Cable Companies from continuing to engage in the alleged illegal practices.

The Cable Companies' filed preliminary objections to the class action complaint and Kaplan responded by filing an amended complaint on November 29, 1993 raising the same three claims. Once again Suburban and Cablevision filed preliminary objections on December 17, 1993 and January 7, 1994, respectively. Kaplan filed preliminary objections and an answer to the Cable Companies' preliminary objections on January 25, 1994. Oral argument was scheduled for August 17, 1994 but was rescheduled for November 1, 1994 when the trial judge recused himself. On November 2, 1994, the court entered an order granting the Cable Companies' preliminary objections, denying Kaplan's preliminary objections and dismissing Kaplan's amended complaint with prejudice. Kaplan

1. In August of 1993 Suburban purchased Cablevision and notified Cablevision subscribers that the same Subscription Agreement remained in effect with Suburban.

then filed the instant appeal which was certified for *en banc* review.

Our scope of review from an order which sustains preliminary objections in the nature of a demurrer is plenary. *Smith v. Exxon Corporation,* 436 Pa.Super. 221, 223, 647 A.2d 577, 578 (1994). We must determine the legal sufficiency of the appellant's complaint and decide whether sufficient facts have been pled which would permit recovery by the plaintiff if ultimately proven. *Id.* We must accept as true all well-pleaded facts contained in the complaint together with all reasonable inferences which may be deduced therefrom. *Al Hamilton Contracting Company v. Cowder,* 434 Pa.Super. 491, 495, 644 A.2d 188, 190 (1994). We will sustain the trial court's demurrer if the facts pled in the plaintiff's complaint could not possibly state a cause of action permitting recovery. *Id.*

Section 201-3 of the UTPCPL makes it unlawful to engage in "unfair methods of competition and unfair or deceptive acts or practices." 73 P.S. § 201-3. Sections 201-2(4)(i) through (xvii) delineate examples of "unfair methods of competition" and "unfair or deceptive acts or practices." 73 P.S. § 201-2(4). Count one of Kaplan's amended complaint alleged that the Cable Companies violated sections 201-2(4)(v), (xiv) and (xvii) of the UTPCPL.[2] Kaplan complained that the following conduct constituted an unfair and deceptive trade practice: (1) requiring customers to pay in advance for cable transmission then failing to provide continuous, uninterrupted cable programming; (2) failing to credit or refund money paid for such continuous and uninterrupted programming when outages occur; (3) misleading customers as to the availability of rebates by failing to specify how subscribers may be reimbursed for interruptions; and (4) actively deterring customers from requesting credit for the cable outages.

2. In the amended complaint Kaplan averred that the Cable Companies violated section 201-2(4)(ii) of the UTPCPL. Kaplan abandons this subsection on appeal and bases his UTPCPL claim solely on subsections (v), (xiv), and (xvii).

In *Commonwealth ex rel. Creamer v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974), our Supreme Court explained the Legislature's purpose in enacting the UTPCPL. The Court explained:

> The Legislature sought by the Consumer Protection Law [UTPCPL] to benefit the public at large by eradicating, among other things, "unfair or deceptive" business practices. Just as earlier legislation was designed to equalize the position of employer and employee and the position of insurer and insured, this Law attempts to place on more equal terms seller and consumer. These remedial statutes are all predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace. Instantly, the Legislature strove, by making certain modest adjustments, to ensure the fairness of market transactions. No sweeping changes in legal relationships were occasioned by the Consumer Protection Law, since prevention of deception and the exploitation of unfair advantage has always been an object of remedial legislation.

> Although the Consumer Protection Law did articulate the evils desired to be remedied, the statute's underlying foundation is fraud prevention. This Court emphatically stated in *Verona v. Schenley Farms Co.*, 312 Pa. 57, 64, 167 A. 317, 320 (1933), "[a]s a statute for the prevention of fraud, it must be liberally construed to effect the purpose...."

> Since the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices.

*Commonwealth ex rel. Creamer v. Monumental Properties*, 329 A.2d at 815–17 (citations and footnotes omitted). *See also Pirozzi v. Penske Olds–Cadillac–GMC, Inc.*, 413 Pa.Super. 308, 313, 605 A.2d 373, 375 (1992), *alloc. den.*, 532 Pa. 665, 616 A.2d 985 ("The purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices[.]").

In his appeal Kaplan initially argues that the Cable Companies violated section 201–2(4)(v) of the UTPCPL which prohib-

its "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have[.]" 73 P.S. § 201-2(4)(v). He claims that the Cable Companies misrepresented in the Subscription Agreement that they would provide continuous, uninterrupted cable programming.

Kaplan acknowledges in the amended complaint that the Cable Companies' contractual duties are defined by the terms of the Subscription Agreement which every cable subscriber executes prior to receiving cable services. Kaplan, however, does not specify which paragraph of the Subscription Agreement obligates the Cable Companies to provide continuous, uninterrupted cable service or unrequested credits for periods of interruption. He instead urges us to read into the Agreement by "necessary implication" this contractual obligation.

The doctrine of necessary implication is a principle of contract law which allows the court to imply a contract term "where it is clear that an obligation is within the contemplation of the parties at the time of the contracting or is necessary to carry out their intentions[.]" *Slater v. Pearle Vision Center, Inc.*, 376 Pa.Super. 580, 586, 546 A.2d 676, 679 (1988). Our Supreme Court explained:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Id.* (citing *Frickert v. Deiter Brothers Fuel Company, Inc.*, 464 Pa. 596, 347 A.2d 701 (1975)). The court may apply the doctrine of necessary implication in only limited circumstances; it may imply a missing term in a parties' contract only when it is necessary to prevent injustice and it is abundantly clear that the parties intended to be bound by such term. *Id.*

■ We are unpersuaded by Kaplan's argument that the doctrine of necessary implication applies in the present case. We may not imply the contractual duty to provide continuous uninterrupted service or unrequested credits for outages when it is unclear whether the Cable Companies clearly intended to be bound by this obligation. The Cable Companies did not expressly state this obligation nor does the Subscription Agreement contain any provisions which suggest that the Cable Companies obligated themselves to provide continuous, uninterrupted service or to automatically provide rebates for interruptions in service. *Compare Slater v. Pearle Vision Center, Inc.*, 546 A.2d at 679–80 (several provisions in the lease suggested that the parties contemplated at the time of executing the commercial lease that Pearle would be obligated to actually occupy and use the premises). The trial court correctly concluded that the Cable Companies "did not represent that they would automatically credit subscribers for outages within [their] control." Trial Court Opinion, 4/12/95, at p. 7. Accordingly, we do not agree with Kaplan that the Cable Companies misrepresented that they would provide continuous, uninterrupted service or in the alternative provide voluntary, unsolicited refunds.

Kaplan also argues that the Cable Companies violated section 201–2(4)(v) of the UTPCPL by misrepresenting that they are responsible for cable outages within their control. Once again the Cable Companies did not include this term in the Subscription Agreement nor did they imply it by other provisions in the Subscription Agreement. Kaplan claims that because the Cable Companies refunded money to customers who specifically requested rebates for periods of cable outages, this necessarily obligates them to automatically refund money to all customers who experience an outage regardless if they request such a refund.

We are unpersuaded by Kaplan's argument. The fact that the Cable Companies gratuitously provide a refund when requested by a customer does not contractually obligate them to do so in all instances of cable interruption. The Cable Companies point out that they rely on the subscribers' calls to

notify them if an interruption in service occurs. They argue that without this notification they cannot issue a refund of cable fees, therefore, the notification requirement is neither unreasonable or illogical. We will not imply a term in the Subscription Agreement that obligates the Cable Companies to provide credits for cable outages when they have no notice that an outage has occurred.

■ In his last claim under section 201–2(4)(v) of the UTPCPL Kaplan argues that the Cable Companies misrepresented their responsibility for cable outages in the Subscription Agreement and deterred their customers from requesting credits by disclaiming liability in certain "emergency" situations specifically delineated in paragraph nine of the Subscription Agreement. Kaplan's argument is difficult to comprehend. In paragraph nine of the Subscription Agreement the Cable Companies specifically declared:

> Company shall not be responsible for damages by reason of a failure to furnish audio or video signals or to complete any of the work required of Company under this agreement where such failure is the result of any strike, war, riot, insurrection, civil commotion, fire, flood, accident, storm, or any Act of God or any other cause beyond the control of the Company, including but not limited to Federal, state and local regulatory requirements now or hereafter in existence.

Paragraph 9, Subscription Agreement.

The terms of paragraph nine of the Subscription Agreement are clear. This clause, which is known as a "force majeure" clause,[3] excuses the Cable Companies' duty to provide cable service if one of the delineated events occurs. The clause does not represent that the Cable Companies will provide rebates for outages that are within their control without a specific request by the subscriber.

3. A force majeure clause lists a series of events such as earthquakes, storms, floods, natural disasters, wars, or other "acts of God" which the parties to a contract have agreed upon as excuses for nonperformance. JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS 639 (1990).

■ Next, Kaplan argues that his amended class action complaint stated a valid cause of action under section 201–2(4)(xiv) of the UTPCPL which makes it unlawful to "[f]ail[ ] to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made[.]" 73 P.S. § 201–2(4)(xiv). The trial court rejected this claim because Kaplan failed to plead that the Cable Companies breached a *written* guarantee or warranty that they would provide continuous, uninterrupted cable service. In the absence of such a written warranty, we agree with the trial court that no cause of action under section 201–2(4)(xiv) can be sustained.

Kaplan also contends that his amended complaint sets forth an actionable claim under the "catch-all" provision of the UTPCPL—subsection (xvii)—which prohibits "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xvii). Kaplan did not include this claim in his amended complaint. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a), 42 Pa.C.S.A.; *Weir v. Weir,* 428 Pa.Super. 515, 523, 631 A.2d 650, 654 (1993). Thus, we will not examine the merits of Kaplan's claim.[4]

In the second count of the amended complaint Kaplan set forth a cause of action based on the Cable Companies' alleged breach of their contractual duties of good faith and fair dealing. He contended that the Cable Companies failed to act in good faith by deliberately providing insufficient, confusing and misleading representations regarding the subscribers'

4. We reject Kaplan's excuse as to why he did not raise this issue in the amended complaint. He claims that he did not include a claim based on subsection (xvii) in the amended complaint because of this Court's statement in *Prime Meats v. Yochim,* 422 Pa.Super. 460, 619 A.2d 769 (1993), *alloc. den.,* 538 Pa. 627, 646 A.2d 1180 (1994), where we reiterated that *generally* fraud is not an appropriate cause of action for a class action because of each individual plaintiff's need to prove his reliance on the defendant's misrepresentation. *Id.* at 774 (citing *Klemow v. Time, Inc.,* 466 Pa. 189, 197, 352 A.2d 12, 16 (1976), *cert. den.* 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976)). That general principle does not explain why Kaplan did not raise a claim based on section 201–2(4)(xvii) in his amended complaint.

right to credit for service interruptions. He further claims that the Cable Companies concealed their policy of providing pro-rata credits from their customers. He requested the Cable Companies to credit or refund an appropriate pro-rata share of the fees collected in advance from its subscribers for times when the subscriber experienced a cable outage.

Section 205 of the Restatement (Second) of Contracts, which was adopted by this Court in *Baker v. Lafayette College,* 350 Pa.Super. 68, 84, 504 A.2d 247, 255 (1986), *aff'd.,* 516 Pa. 291, 532 A.2d 399 (1987), and *Creeger Brick & Building Supply, Inc. v. Mid–State Bank & Trust Company,* 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989), provides: "Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts, § 205. A similar requirement has been imposed upon contracts within the scope of the Uniform Commercial Code (UCC) by 13 Pa.C.S.A. section 1203. *Somers v. Somers,* 418 Pa.Super. 131, 135, 613 A.2d 1211, 1213 (1992). "Good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa.C.S.A. § 1201. The breach of the obligation to act in good faith cannot be precisely defined in all circumstances, however, examples of "bad faith" conduct include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers,* 613 A.2d at 1213 (citing Restatement (Second) of Contracts, § 205(d)).

Kaplan's argument that the Cable Companies failed to act in good faith is premised on their alleged duty to provide continuous service or voluntarily rebate fees paid in advance by the cable subscribers when an outage occurs. We previously concluded that the Cable Companies were not contractually bound to provide such service or credit and that they made no representations regarding the right to such credits. The Cable Companies' conduct in providing credits when a subscriber notified them of a service interruption

evidences honesty and good faith conduct, not bad faith conduct as Kaplan suggests. Hence, we agree with the trial court's determination that Kaplan failed to set forth a viable claim for breach of the contractual duties of good faith and fair dealing.

 In his third question presented, Kaplan claims that count three of his amended complaint stated an actionable claim for breach of the implied warranty of merchantability which is allegedly embodied in the Subscription Agreement.

Pennsylvania has adopted the implied warranty of merchantability found in Division II of the UCC at 13 Pa.C.S.A. section 2314. That section provides in pertinent part:

(a) **Sale by merchant.**—Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(b) **Merchantability standards for goods.**—Goods to be merchantable must be at least such as:

(1) pass without objection in the trade under the contract description;

(2) in the case of fungible goods, are of fair average quality within the description;

(3) are fit for the ordinary purposes for which such goods are used;

(4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

(5) are adequately contained, packaged, and labeled as the agreement may require; and

(6) conform to the promises or affirmations of fact made on the container or label if any.

13 Pa.C.S.A. § 2314.

The trial court granted the Cable Companies' demurrer to this claim on the grounds that the Subscription Agreement is

a contract for the Cable Companies' services and does not contemplate a "transaction in goods" which is a prerequisite for the UCC and the implied warranty of merchantability to apply. *See* 13 Pa.C.S.A. § 2102 (limits the scope of Division II of the UCC to transactions in goods); *Stephenson v. Greenberg*, 421 Pa.Super. 1, 9, 617 A.2d 364, 368 (1992), *alloc. den.*, 535 Pa. 649, 633 A.2d 153 (1993) ("For the Sales Article of the [UCC] to apply there must be a 'transaction in goods.'"). Kaplan argues on appeal that a cable television signal is movable and hence satisfies the definition of "goods" set forth in 13 Pa.C.S.A. section 2105(a). Section 2105(a) defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than money in which the price is to be paid, investment securities ... and things in action." 13 Pa.C.S.A. § 2105(a). "This definition embraces every species of property other than real estate, choses in action, or investment securities." *Lobianco v. Property Protection, Inc.*, 292 Pa.Super. 346, 349, 437 A.2d 417, 419 (1981).

We have found no case law in this Commonwealth which has determined whether the supply of cable television programming is a "transaction in goods" so as to trigger the implied warranty of merchantability in Division II of the UCC. We will review analogous cases to resolve this novel issue.

In *Gardiner v. Philadelphia Gas Works*, 413 Pa. 415, 197 A.2d 612 (1964), the appellants sued the appellee gas company for personal injuries they sustained when gas escaped from the underground pipe leading into their home. The trial court sustained the gas company's preliminary objections and dismissed the complaint on the grounds that the action was barred by the two year statute of limitations for personal injury actions based on a tort claim. The precise issue on appeal was whether the two year statute of limitations for torts or the four year statute of limitations for breach of warranty contained in the UCC governed. In reaching its conclusion that the UCC's four year statute of limitations applied, our Supreme Court summarily noted that the supply of gas to the appellants' home on a month-to-month basis fell

within the definition of a contract for sale under the UCC. *Id.* at 614 n. 8.[5] Our Supreme Court did not decide the precise issue of whether the sale of gas was a "transaction in goods." Rather, the Court noted in a footnote that the sale of gas on a month-to-month basis constituted a "contract for sale" as defined by the UCC. *Id.*

In *Field v. Golden Triangle Broadcasting, Inc.,* 451 Pa. 410, 305 A.2d 689 (1973), *cert. den.,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974), our Supreme Court held that a sale of the businesses of two radio stations, including their tangible and intangible assets, was not a transaction in goods under the UCC. *Id.* at 696. The Court relied on the fact that the license, good will, real estate, radio studio, and transmission equipment were not movable and hence did not fall under the UCC's definition of goods. *Id.*

In *Schriner v. Pennsylvania Power & Light Company,* 348 Pa.Super. 177, 501 A.2d 1128 (1985), this Court was presented with the issue of whether the doctrine of strict liability in tort under section 402A of the Restatement (Second) of Torts may be asserted against a public utility supplying electricity. To apply section 402A against the electric company, the Court had to first determine if electricity was a "product" for purposes of strict liability. *Id.* at 1132. This Court adopted the reasoning of the Wisconsin Supreme Court in *Ransome v. Wisconsin Electric Power Company,* 87 Wis.2d 605, 275 N.W.2d 641 (1979), and reasoned that the distribution of the electricity was a service, but once the electricity passed through the customer's meter it entered the stream of commerce and became a product within the meaning of section 402A. *Schriner,* 501 A.2d at 1134. This Court's decision in *Schriner* dealt solely with the applicability of section 402A of the Restatement (Second) of Torts and did not address whether supplying electricity was a transaction in goods governed by the UCC.

5. When *Gardiner* was decided, the UCC was codified at 12 P.S. section 2–101 *et seq.* and the definition of "contract for sale" was found at 12 P.S. section 2–106.

In *Whitmer v. Bell Telephone Company of Pennsylvania*, 361 Pa.Super. 282, 284, 522 A.2d 584 (1987), this Court determined "whether the use, or attempted use, of a public pay telephone involve[d] a 'transaction in goods' so as to trigger application of implied warranties imposed by Article II of the [UCC] as it has been adopted in Pennsylvania." *Id.* at 585 (footnote omitted). This Court held that "neither the use, nor the attempted use, of a public pay telephone involves a 'transaction in goods' and consequently, the implied warrant provisions of Article II of the Code do not apply." *Id.* We reasoned that when the appellant picked up the receiver of a public pay telephone she attempted to utilize the services offered by the phone company. She was not attempting to purchase a tangible, movable good. We distinguished *Gardiner* and *Schriner* as follows:

> Herein lies the distinction between *Gardiner* and *Schriner* and the instant case. The gas and electric utilities provide both transmission services and the products to be transmitted. The telephone company, however, provides transmission services, but not the communication to be transmitted. While the telephone company does provide certain incidental communications (for instance, directory assistance), the predominant nature of the transaction remains the transmission of consumer provided communications from one location to another which is the rendition of a service. When the transaction involves predominantly the rendition of services, the fact that tangible movable goods may be involved in the performance of services does not bring the contract under the Code.

*Whitmer*, 522 A.2d at 587 (citations omitted) (emphasis omitted).

In *Gall v. Allegheny County Health Department*, 521 Pa. 68, 555 A.2d 786 (1989), our Supreme Court held that the sale or supply of water by a municipal water authority constituted a transaction in goods subject to the implied warranty of merchantability. *Id.* at 789. Our Supreme Court reasoned that because water can be measured by a flow meter, it is

movable and hence satisfied the UCC's definition of a good. *Id.*

Finally, we recognize the federal decision of *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351 (4th Cir.1983), *cert. den.*, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984), where the Fourth Circuit Court of Appeals held that the defendant cable company offered a service and not "goods" as defined by the Clayton Act, 15 U.S.C. section 14. The Clayton Act covers only "goods, wares, merchandise, machinery, supplies or other commodities[.]" *Id.* The Court found that the dominant nature of the transaction was broadcasting which is a service and that the supply of transmission equipment, which could be considered a good, was incidental to the provision of the service. *Satellite Television*, 714 F.2d at 354. Thus, the Court concluded that the exclusivity provision entered into by the cable television company and apartment owners did not come within the purview of the Clayton Act. *Id.* at 354.

After reviewing these various cases we agree with the trial court that the transmission of cable television programming is not a "transaction in goods" as defined by section 2105(a) and relevant case law. Although the audio and video signals which the Cable Companies transmit move through the cable wires, the Official comment to section 2105 instructs us that the definition of goods "is not intended to deal with things which are not fairly identifiable as movables before the contract is performed." 13 Pa.C.S.A. § 2105, UCC Comment 1. The signals transmitted through the cable wires to the subscriber's home are not "fairly identifiable as movables before the contract is performed." The Cable Companies do not sell a tangible, separate identifiable good—instead they supply a continuous stream of audio and video signals. Unlike gas and electric companies which generate the products they provide, the Cable Companies do not generate the signals which they transmit to the subscribers. They merely act as a common carrier transmitting numerous cable signals through cable wires into the subscriber's home.

Moreover, unlike gas, electricity, or water, where the quantity consumed by the consumer is readily measurable, the quantity of cable programming that each subscriber receives is difficult to ascertain. We find the analysis in *Whitmer* with the use of a public telephone illustrative. When an individual inserts money into the public telephone, he pays for the telephone company to transmit his message over the telephone wires. When a cable subscriber turns on his television, he pays for the cable company to transmit the television signal through the cable wires into his television. The dominant purpose of the Subscription Agreement is to provide a cable television programming service; any equipment supplied by the Cable Companies to transmit the signals into the subscriber's home is incidental to the service. *Satellite Television & Associated Resources, Inc.*, 714 F.2d at 354.

Even assuming *arguendo* that the transmission of cable television constitutes a "transaction in goods" as defined by the UCC, we find an alternative basis for affirming the trial court's order granting the demurrer to count three of Kaplan's amended complaint. *See Al Hamilton Contracting Co. v. Cowder*, 644 A.2d at 190 (trial court's order may be affirmed on appeal if it is correct on any legal theory regardless of the reason or theory adopted by the trial court). Kaplan's allegations in count three of the amended complaint were insufficient to constitute a cause of action for the breach of the implied warranty of merchantability. Kaplan does not complain that the cable programming he received was unmerchantable. He does not allege that the "goods" were "unfit" for the ordinary purpose for which such programming is used, nor does he allege that the programming he received was low quality or defective. On the contrary, Kaplan complains that he is entitled to a rebate for periods of cable interruption. This allegation does not assert a cause of action based on the implied warranty of merchantability. *Compare Moscatiello v. Pittsburgh Contractors Equipment Company*, 407 Pa.Super. 363, 371, 595 A.2d 1190, 1194 (1991), *alloc. den.*, 529 Pa. 650, 602 A.2d 860 (1992) (defendant breached implied warranty of merchantability when it sold a concrete paving machine which

failed to lay concrete evenly and thus was unfit for ordinary purpose for which it was used).[6]

Order affirmed.

HESTER, J., files a dissenting opinion.

ROWLEY, President Judge, did not participate in the consideration or decision of this case.

HESTER, Judge, dissenting:

I respectfully dissent from the decision reached by the majority. I believe that the complaint contains allegations sufficient to demonstrate that the cable company committed an unfair trade practice by failing to make public its practice of refunding for service outages and by failing to comply with the terms of its subscription agreements to refund for service outages caused by circumstances within its control.

This case was instituted as a class action by cable television subscribers to recover against a cable television company for, among other things, its alleged violation of the Unfair Trade Practices and Consumer Protection Law (the "Act"), 73 P.S. 201–1, *et seq.* The trial court sustained the cable company's preliminary objections to the complaint, determining that appellants had failed to state a claim upon which relief could be granted.

Our standard of review when the trial court has granted preliminary objections follows:

> A preliminary objection in the nature of a demurrer admits every well-pleaded fact and all inferences reasonably deducible therefrom. *McGaha v. Matter,* 365 Pa.Super. 6,

---

6. Kaplan raises an additional issue in this appeal which we are unable to address. He argues that the trial court should not have granted the Cable Companies' preliminary objections because in doing so it contradicted its own ruling in *Goldman v. Comcast Cablevision Corporation,* No. 93–16895 (Montgomery County, filed 8/26/94), where the plaintiff cable subscriber asserted similar claims as those raised by Kaplan. The *Goldman* case is not on appeal before this Court and we are not called upon to review the trial court's disposition of that case. Moreover, the trial court explained that the facts in *Goldman* were distinguishable from the facts in the present case thus meriting different results.

8, 528 A.2d 988, 989 (1987); *Pike County Hotels, Corp. v. Kiefer*, 262 Pa.Super. 126, 133, 396 A.2d 677, 681 (1978). It tests the legal sufficiency of the challenged complaint and will be sustained only in cases where the pleader has clearly failed to state a claim for which relief may be granted. *Mudd v. Hoffman Homes For Youth, Inc.*, 374 Pa.Super. 522, 524, 543 A.2d 1092, 1093 (1988).

*Kelly–Springfield Tire Co. v. D'Ambro*, 408 Pa.Super. 301, 303, 596 A.2d 867, 868 (1991), quoting *Creeger Brick v. Mid–State Bank*, 385 Pa.Super. 30, 32–33, 560 A.2d 151, 153 (1989).

In the present case, the complaint includes the following allegations. The cable company provides cable services to its subscribers for a monthly fee. The subscription agreements provide that the company is not responsible for damages if service is interrupted due to strike, war, riot, insurrections, commotion, fire, flood, accident, storm, act of God, or other cause beyond the control of the cable company. The cable company's practice is to limit refunds for service outages within its control to customers only if those customers complain, and it never has told its subscribers that they can, in certain circumstances, obtain refunds for outages.

I believe that this practice is an unfair trade practice under the Act. A fair reading of the subscription agreements leads to the conclusion that the cable company *is* liable for damages, *i.e.*, loss of service, for any service interruptions which are within its control. The agreement expressly limits the company's liability for damages only when service is interrupted due to enumerated circumstances, all of which are beyond the control of the company. Thus, the company, by necessary implication, agreed to give customers damages for service outages which are within its control.

Its alleged refusal to do so under the agreements is a breach of those agreements and an unfair trade practice under the Act since the Act defines an unfair trade practice to include "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made." 73

P.S. § 201–2(xiv). That the company had an unpublished practice of issuing a credit to customers who complain reinforces the interpretation of the contract that the company is responsible for refunds when service is interrupted due to equipment and other failures within its control. The company should have made all of its subscribers aware of this practice. Accordingly, I dissent.