J-A05040-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| WILLIAM H. ANTANTIS, JR. AND JENNA ANTANTIS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAUL D. KOLAROSKY, AMERICAN DREAM SETTLEMENT, INC., JULIE ANN GRAHAM, REMAX AND REMAX COMMUNITY REAL ESTATE | : | No. 1311 WDA 2019 |
| | : | |
| | : | |
| APPEAL OF: JULIE ANN GRAHAM, REMAX AND REMAX COMMUNITY REAL ESTATE | : | |

Appeal from the Order Entered July 25, 2019
In the Court of Common Pleas of Washington County Civil Division at
No(s): 2017-6100

BEFORE: BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                    FILED MARCH 11, 2020

This appeal involves the sale of a house and lot located at 332 McCarrell Road, Mount Pleasant Township, Washington County, Pennsylvania (the Property). In that transaction, Julie Ann Graham, Remax (Graham) and Remax Community Real Estate (Remax) served as the agent of the buyers, William H. Antantis, Jr. and Jenna Antantis (Buyers), as well as the seller, Paul D. Kolarosky (Kolarosky). The Buyers prevailed at trial against Graham on counts of misrepresentation and breach of contract and against Remax on a

_____

* Retired Senior Judge assigned to the Superior Court.

count of misrepresentation. Graham and Remax now appeal the denial of their post-trial motions by the Court of Common Pleas of Washington County (trial court). We affirm.

I.

The Buyers purchased the Property in 2015 for $149,500. Soon after, the Buyers came to believe that its condition did not correspond with what Graham and Remax had previously represented to them. In 2017, the Buyers filed a complaint, asserting that Graham and Remax[1] each committed a breach of contract and fraud by making statements about the Property relating to the absence of mold, access to public water sources, and the size of the lot.[2] Graham and Remax answered, denying the Buyers' allegations. Further,

_____

[1] The caption of the Buyers' complaint named the following parties as defendants: Graham, Kolarosky, "American Dream Settlements, Inc., a corporation," and "RE/MAX, a corporation." In paragraph 5 of the complaint, the Buyers specified that "Defendant, Re/Max Community Real Estate, is a corporation with a Pennsylvania address[.]" Complaint, 12/1/2017, at paragraph 5. Remax noted in its answer that the caption of the complaint had incorrectly designated it, omitting the words, "Community Real Estate." However, Remax did not specifically deny paragraph 5 of the complaint, and its answer addressed the substance of the claims against it. The Buyers did not amend their complaint to conform the caption to paragraph 5, and Remax did not seek relief on that basis until its post-trial motion was filed – after the verdict had already been entered against "Remax Community Real Estate."

[2] The Buyers also asserted the same claims against Kolarosky and the land surveying company, American Dream Settlements, Inc., a corporation (ADSI). Prior to trial, ADSI and Kolarosky settled with the Buyers and were granted leave to file a new matter to plead the settlement as a defense. ADSI and Kolarosky did not participate in the present appeal.

Remax independently asserted that it did not employ Graham and could not be held liable for her representations. The matter then proceeded to a jury trial.

The trial court summarized the facts adduced at trial in its 1925(a) opinion. As to the description of the acreage, the trial court set forth evidence that the Buyers were induced to purchase the Property by being led to believe that the lot was a greater size than it actually was:

> According to Mr. Antantis, prior to closing, he had several conversations with [Graham] concerning the amount of acreage to be purchased and the quality of the Kolarosky home. With regard to a home inspection, Mr. Antantis stated he did not obtain one, because he relied upon advice from [Graham] that an inspection was unnecessary. Mr. Antantis stated that [Graham] offered to provide him a copy of an inspection report from a prior potential buyer who chose not to purchase the property. With regard to the acreage, Mr. Antantis stated that [Graham] told him a "survey" showing the property contained 4.46 acres was available from Mr. Kolarosky and would be provided at closing. Mr. Antantis stated that [Graham] never advised him to obtain a survey. Prior to closing, Mr. Antantis received information that the property may only contain 3 acres. Mr. Antantis discussed this discrepancy with [Graham], who indicated that she would discuss the matter with the "mapping department." Mr. Antantis reiterated that he and his wife were not interested in buying a property that had only three acres. According to Mr. Antantis, at closing, [Graham] assured him that the property included 4.46 acres.
>
> [Graham] admitted that she changed the property listing acreage from 3 acres to 4.4 acres at the insistence of Mr. Kolarosky. [Graham] testified that she forwarded to the Antantis[es] the drawings Mr. Kolarosky provided to her indicating the acreage of the property. [Graham] testified that Mr. Kolarosky's deed indicated a 4.486 parcel that had a prior sale and reservation of a 1.463 parcel, but she did not understand the deed.

Mr. James Noble, a certified real estate appraiser with over 16 years of experience . . . testified that he first completed an appraisal on February 3, 2015. This first appraisal indicated that [the property] consisted of 4.46 acres with three contiguous acres and 1.46 acres across the road. Mr. Noble also identified a second appraisal he completed for the property. The second appraisal was dated February 9, 2015. In the second appraisal, Mr. Noble described the property as being approximately 2.81 acres. Mr. Noble testified that [Graham] provided the survey for the property to generate the revision. Mr. Noble testified that [Graham] contacted him to make the revision. Mr. Noble testified that he learned the acreage of the property through the multi-list statement from [Remax]. Mr. Noble further testified that he believed [Graham] contacted him regarding making the revision to his first appraisal.

Trial Court Opinion, 7/25/2019, at 5-7 (citations omitted).

As to the presence of black mold on the Property, the trial court outlined evidence that the Buyers were misled about that defect, which was prevalent due to serious water intrusions:

Shortly after occupying their new home, [the Buyers] encountered several problems that were water related. They learned that they did not own the spring from which their water supply was being drawn. They discovered a large amount of invasive black mold in their home. The persistence of the mold requires heavy cleaning of the Antantis Home two times per week by Mrs. Antantis. Their son often stays several days per week with his grandparents to avoid the effects of mold.

Mr. Gregory Wilson, a representative of Royal Recovery Services, Incorporated which does property preservation and mold remediation, testified. Mr. Wilson was contacted and visited the subject property twice. Mr. Wilson noted that there was water laying along the driveway in the back of the house, there was a lot of water on the rear wall of the house, mold in the rafters, and some mold on the walls. Mr. Wilson testified that there was an old well under the addition to the house and that water either overflowed from the well or seeped out of the well. Further, Mr. Wilson stated that there was mud that had entered the basement as a result of the water. Mr. Wilson observed mold on the exterior

walls. Mr. Wilson opined that the gutters of the house needed [to be] rerouted away from the house. Mr. Wilson opined that the house needed a French drain to curtail the water running into the house.

Overall, Mr. Wilson indicated that the house needed the gutters rerouted, French drain installed, a water prevention membrane, a sump pump, a dehumidifier, removal of paneling upstairs, and removal of insulation from affected walls. Mr. Wilson testified that the cost to do the mold work would be over $52,000.

Id. at 7-9 (citations omitted).

After its deliberations began, the jury sent a message to the trial court asking if it had "to attach a specific dollar amount for damages, or . . . just specifying what damages are relevant." Trial Transcripts, 3/21/2019, at 88. The trial court responded:

[I]f you get to the point of damages, you are to determine a specific amount of damages, and you're to specify those damages that are relevant. That's in a dollar amount. So if you are considering damages, you should be considering matters that are relevant to the case, and that alone.

Id.

The jury then entered a verdict in favor of the Buyers on their claim of breach of contract against Graham. The jury awarded "$25,000 to compensate for the absence of the 1.46 acres[,] determined by the percentage breakdown from the tax assessment applied to the [Property's] appraisal value of $150,000." Id. at 93. The jury also found that both Graham and Remax committed fraud regarding the mold on the Property and awarded the Buyers damages of "$52,008 as outlined on [a mold remediation] plan[,]" as well as all court costs the Buyers had incurred. Id. at 94.

Regarding the lack of a water source on the Property, the jury wrote on the verdict form that the issue would "be remediated by [Graham] by incurring all costs associated with the installation of running city water to [the Property.]" Id. at 93. No dollar amount was entered on the verdict form as to that item.

Because the jury could not award an indefinite amount and no evidence was offered as to the cost of that connection, the trial court struck that portion of the jury verdict requiring Graham to pay for the cost of connecting the Property to a "city" water source. The final verdict totaled $77,008, plus court costs, with $52,008 allotted for mold remediation on the fraud count and $25,000 for diminished lot size on the breach of contract count.[3]

Graham and Remax filed post-trial motions seeking a new trial and judgment notwithstanding the verdict. They argued that the evidence of fraud and breach of contract was legally insufficient, that the verdict was against the weight of the evidence, and that the jury's verdict on damages had resulted from confusion about the issues it was supposed to resolve. Remax also argued that it was not a proper party to the Buyers' action and that it was not liable for Graham's conduct. The trial court denied the post-trial motions.

_____

[3] Prior to entry of the verdict, Remax had filed a motion for nonsuit, which was granted as to the breach of contract claim.

Graham and Remax timely appealed and both they and the trial court complied with Pa.R.A.P. 1925.

II.

A.

Graham first contends that the jury's verdict on the breach of contract count (regarding the Property's lot size) is not supported by sufficient evidence and is contrary to the weight of the evidence.[4]

_____

[4] When reviewing the sufficiency of the evidence, this Court must determine whether the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the verdict winner, was sufficient to enable the factfinder to find against the losing party. We note that, [a] challenge to the sufficiency of the evidence in a civil case is reviewed on appeal as a claim that the trial court erred in denying a motion for judgment notwithstanding the verdict[.]

Krishnan v. Cutler Group, Inc., 171 A.3d 856, 879 n.14 (Pa. Super. 2017) (citations and quotations omitted).

The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider de novo the underlying question of the weight of the evidence. An appellate court may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim. Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice.

Tong-Summerford v. Abington Memorial Hosp., 190 A.3d 631, 659 (Pa. Super. 2018) (quoting Commonwealth v. Cash, 137 A.3d 1262, 1270 (Pa. 2016)) (quotations omitted).

To prove their breach of contract claim, Buyers had the burden of showing by a preponderance of the evidence that a contract between them and Graham existed; that Graham breached a duty imposed by the contractual terms; and that damages resulted from the breach. See Hart v. Arnold, 884 A.2d 316, 332 (Pa. Super. 2005). At trial, the parties agreed that the Buyers had a contract with Graham and that factual issue was not put before the jury. See Trial Transcript, 3/21/2019, at 50. Nonetheless, Graham asserts that the breach of contract claim could not be proven as a matter of law because the written contract between her and the Buyers was never introduced into evidence.

Even though the written contract was never admitted at trial, there was sufficient evidence to make out the breach of contract claim. Graham testified that she acted as the Buyers' real estate agent, and that she had explained to them how it would be possible to serve in a dual capacity as an agent of both a buyer and a seller. The written sales agreement for the Property between the Buyers and the seller, Kolarosky, also established that a contract existed between Graham and the Buyers. There was also evidence that the Property's lot was only three acres despite the fact that Graham had represented to the Buyers that it was 4.46 acres.

Once the existence of the contract between Graham and the Buyers was established, it was not necessary for the exact written terms of the contract to be introduced. Those terms were irrelevant for present purposes because

the issue here involves not a breach of a specific term but rather a lack of good faith. "Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716, 722 (Pa. Super. 1996) (quoting Restatement (Second) of Contracts, §205). Good faith is defined as "honesty in fact in the conduct or transaction concerned." Kaplan, 671 A.2d at 722 (quoting 13 Pa.C.S. § 1201(b)(20)).

"The breach of the obligation to act in good faith cannot be precisely defined in all circumstances, however, examples of 'bad faith' conduct include 'evasion of the spirit of the bargain[.]'" Kaplan, 671 A.2d at 722 (quoting Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992)). This duty of good faith and fair dealing may be enforced in a breach of contract action. See LSI Title Agency, Inc. v. Evaluation Services, 951 A.2d 384, 391 (Pa. Super. 2008).

The Buyers testified that they relied on Graham's assurances that the Property was 4.46 acres when, in fact, it was only about three acres. The jury also heard testimony and received documentary evidence that Graham misled the Buyers into believing that the Property's lot size was much larger than it actually was. The Buyers had stressed to Graham that they were only interested in purchasing a lot containing five or more acres, so Graham's misleading conduct amounted to an evasion of the spirit of the bargain.

The jury's verdict slip specifically refers to the "the absence of the 1.46 acres" as the damages that flowed from Graham's breach of contract. The jury awarded the Buyers $25,000 as compensation for the missing land based in part on evidence of the Property's total assessed value. There is no indication from this that the jury was confused about how to determine the Buyers' damages. The trial court did not abuse its discretion in denying Graham's sufficiency claim as to the breach of contract count because there was competent evidence as to all essential elements of that cause of action.

Moreover, taking in mind the evidence set forth above, the trial court acted within its discretion in finding that the verdict was not against the weight of the evidence. Primarily, Graham seems to argue that the lack of a written contract in the record should have precluded the jury's finding that she breached a contractual duty to the Buyers but, as already discussed, the existence of that contract was not in dispute, and regardless of whether it was formally admitted into evidence, Graham had a contractual duty of good faith. See Trial Transcript, 3/21/2019, at 50. Nothing in the record is so contrary to the jury's verdict as to shock one's sense of justice and, thus, the trial court did not abuse its discretion in denying Graham's post-trial motions for a new trial or judgment notwithstanding the verdict on the breach of contract count.

B.

As to the fraud claim, Graham and Remax challenge the sufficiency of the evidence, asserting that the Buyers did not carry their burden of proving

that a misrepresentation ever occurred. In their complaint, the Buyers stated in pertinent part that Graham and Remax "intentionally or recklessly made false statements and representations" to them that "the property was free of black mold when in fact black mold [was present on the Property] . . . prior to sale[.]" Complaint, 12/1/2017, at Paragraph 15(c). Graham and Remax argue that any misrepresentation that the Buyers received about mold originally came from the seller and was not intentionally conveyed to them by Graham, who never claimed to have personal knowledge of the Property's condition.

Real estate agents are responsible for misrepresentations, both willful and negligent. See Aiello v. Ed. Saxe Real Estate, Inc., 499 A.2d 282 (Pa. 1985). For a claim of intentional misrepresentation, a plaintiff has the burden of proving by clear and convincing evidence the six elements of fraud:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Moreover,

> [i]n real estate transactions, fraud arises when a seller knowingly makes a misrepresentation, undertakes a concealment calculated to deceive, or commits non-privileged failure to disclose. Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.

Milliken v. Jacono, 60 A.3d 133, 140 (Pa. Super. 2012) (quoting Youndt v. First Nat'l Bank of Port Allegany, 868 A.2d 539, 545 (Pa. Super. 2015)).

Even when a real estate broker's false statement is innocently made, a "material misrepresentation may be found whether [the agent] actually knew the truth or not, especially where, as here, it was bound to ascertain the truth before making the representation." Glanski v. Ervine, 409 A.2d 425, 430 (Pa. Super. 1979) (quoting Highmont Music Corp. v. J.M. Hoffman Co., 155 A.2d 363, 366 (Pa. 1959)). This form of fraud – negligent misrepresentation – requires proof of

> (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words. Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another. This Court has not specifically recognized this cause of action in the situation of a real estate broker, but the Superior Court has applied a negligence standard in a number of cases.

Bortz v. Noon, 729 A.2d 555, 560-61 (Pa. 1999) (emphasis added); see also Highmont, 155 A.2d at 366 ("A material misrepresentation may be

found whether [the seller] actually knew the truth or not, especially where, as here, it was bound to ascertain the truth before making the representation.").[5]

In this case, the Buyers assert that Graham misinformed them by advising, "there was no point" in having a home inspection, and that getting one done prior to closing would be a "waste of money." It is undisputed that, while acting as the Buyers' agent, Graham knew of prior water intrusions into the home and yet made those comments. Graham further suggested that the Property was mold-free by providing the Buyers with an inspection report from a previous inquiry into the purchase of the Property – a report that neither confirmed nor refuted the presence of mold.

Even if Graham did not know or explicitly claim to know whether the house had mold, she still dissuaded the Buyers from having the home inspected for that defect without making a reasonable investigation of the truth of her advice. The Buyers followed that advice to their detriment, later discovering mold that would cost them over $50,000 to remediate. Moreover,

_____

[5] "A claim for an 'innocent' misrepresentation has been recognized in this Commonwealth in order to rescind a real estate transaction that is based upon a material misrepresentation, even if the misrepresentation is innocently made." Bortz v. Noon, 729 A.2d 555, 563–64 (Pa. 1999). Such a claim is similar to negligent misrepresentation, but does not include the elements of intent to induce and reliance. Id. This theory of recovery is inapplicable in this case because the Buyers do not seek rescission of the contract for their purchase of the Property. See id.

the Buyers' reliance on Graham's advice was justified in light of her status as their agent and their own relative inexperience in the real estate industry.

Accordingly, there was sufficient evidence from which the jury could conclude that the Buyers carried their burden of proving Graham's negligent misrepresentation, making Graham and Remax liable for the Buyers' resulting damages. See Highmont, 155 A.2d at 366 ("It is not necessary that absolute proof of knowledge or of concealment be shown, for if the defendant had no knowledge of the defective condition of the floors it should not have made the statement that the floors were 'very, very strong[.]'"); see also Glover v. Severino, 946 A.2d 710, 713 (Pa. Super. 2008) ("A misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure.").

C.

Remax argues on sufficiency grounds that it cannot be held liable on the fraud count for Graham's conduct because she was not an agent or employee of Remax. Although Graham testified at trial that she was an independent contractor, see Trial Transcript, 7/2/2019, at 199, we find that this argument lacks merit because of the undisputed facts regarding Graham's association with Remax.

In Aiello v. Ed. Saxe Real Estate, Inc., 499 A.2d 282, 288 n.8 (Pa. 1985), our Supreme Court rejected a similar claim under analogous circumstances. The real estate agency in that case had hired the broker who

handled the transaction; the broker displayed his license in the agency's office; and the agency paid a commission to the broker from the proceeds of the real estate sale. See Aiello, 499 A.2d at 288. The Aiello court held that the broker was not an independent contractor of the real estate agency, and that the agency could be liable for the broker's misrepresentations. Id.

Graham's testimony and supporting exhibits regarding her position with Remax appear to coincide with the facts supporting an agency relationship in Aiello. She maintained an office at Remax's address at 1500 West Chestnut Street, Washington, Pennsylvania. See Trial Transcript, 3/20/2019, at 95; see also Graham and Remax Answer and New Matter, 2/2/2018, at Paragraphs 4-5. Remax assigned Graham to the Property after the seller called the Remax main office line. See Trial Transcript, 3/20/2019, at 96. The contract between the seller and Remax authorized Remax to compensate its "subagents, Buyer-Agents and Transactional Licensees including the share of part of [its] commission." Id. at Trial Transcript, Exhibit G-2, at p. 1.

These facts are sufficient to establish Aiello's test for agency in the real estate context.[6] Thus, Remax could be held liable for Graham's negligent

_____

[6] Regardless, Remax had an independent duty to the Buyers to disclose latent defects on the Property prior to sale, and its inaction exposed it to liability. See Roberts v. Estate of Barbagallo, 531 A.2d 1125, 1131 (Pa. Super. 1987) (finding listing office liable for non-disclosure of a latent defect in real estate, regardless of salesperson's status as an independent contractor because it had not instructed the salesperson to make the disclosure and it owed an independent duty to the buyer).

misrepresentation regarding the presence of mold, and the trial court did not err in rejecting the contrary claim in Remax's post-trial motion.

D.

Finally, Remax contends that it cannot be held liable in this action because the caption of the Buyers' complaint identified it as "Remax, a corporation" rather than its actual name, "Remax Community Real Estate," which appears correctly on the verdict slip. While Remax noted the incorrect designation in its answer to the Buyers' complaint, Remax never stated in its answer, new matter or in a preliminary objection that it was not a proper party in the litigation.[7]

Remax instead answered the allegations and participated in the case as if it was a proper party, thereby acquiescing to the Buyers' designation in the caption of the complaint. The record indicates that Remax was duly served with the Buyers' complaint and received timely notice of all aspects of the proceedings. As a result, Remax was a party to the Buyers' suit, and the

_____

[7] Had Remax objected to the designation and its status as a party rather than simply providing the correct designation in its answer, the trial court would have certainly permitted the Buyers to amend their complaint accordingly. See generally Piehl v. City of Philadelphia, 987 A.2d 146 (Pa. 2009) ("Pa.R.C.P. No. 1033 permits a party to correct the name of an adverse party or amend a pleading at any time either by consent of the adverse party or by leave of court."); see also Papencordt v. Masterwork Paint Co., 194 A.2d 878, 881 (Pa. 1963) ("Defects in process or procedure may always be waived provided there is general jurisdiction of the subject matter."); Pa.R.C.P. No. 1032(a) ("A party waives all defenses and objections which are not presented either by preliminary objection, answer or reply[.]").

correct designation, "Remax Community Real Estate," was properly included on the verdict slip. Thus, for all of the aforementioned reasons, the trial court's order denying Graham and Remax's post-trial motion must stand.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2020